1  Peter Susi, State Bar No. 62957
   Email: psusi@hbsb.com                          (SPACE BELOW FOR FILING STAMP ONLY)
2  Jonathan G. Gura, State Bar No. 214240
   Email: jgura@hbsb.com
3  **HOLLISTER & BRACE**, A Professional Corporation
   1126 Santa Barbara Street
4  Santa Barbara, CA 93101
   Telephone: (805) 963-6711
5  Facsimile: (805) 965-0329

6  Attorneys for Debtor and Debtor-in-Possession

7

8              **UNITED STATES BANKRUPTCY COURT**

9        **CENTRAL DISTRICT OF CALIFORNIA, NORTHERN DIVISION**

10

11  In re                          )   BK No. 9:15-bk-10251-DS
                                    )
12  CLEARWATER NURSERY, INC.,       )   Chapter 11
                                    )
13          Debtors.                )   REPLY TO OBJECTION OF OFFICIAL
                                    )   COMMITTEE OF UNSECURED
14                                  )   CREDITORS TO MOTION FOR ORDER
                                    )   AUTHORIZING USE OF CASH
15                                  )   COLLATERAL
                                    )
16                                  )   Local Bankruptcy Rule
                                    )   9013-1(o)(4)
17                                  )
                                    )   Date:  July 6, 2015
18                                  )   Time:  10:30 a.m.
                                    )   Place: 1415 State Street
19                                  )          Santa Barbara, CA
                                    )          Courtroom 2
20  _____)

21

22       Debtor submits its reply to the opposition of the

23  Committee as follows:

24       I.   **THE DEBT AND THE SECURITY FOR THE DEBT**

25       As noted in the initial motion, the debt of Clearwater

26  Nursery, Inc. ("Clearwater" or "Debtor") to Farm Credit West

27  FLCA ("FLCA") and Farm Credit West PCA ("PCA") totals

28  approximately $15,000,000 broken up as follows:

                            - 1 -

1    Debts of Jafroodi Properties ("Properties") and Jafroodi

2  Family Trust ("Trust") are secured by two adjacent parcels of

3  real property in Nipomo on which the Debtor operates its

4  business, a 20-acre rear property with greenhouses and

5  miscellaneous other improvements and a 40-acre front property

6  on which the bulk of the operations take place.  Both parcels

7  are owned by Properties and secure the approximate $10,000,000

8  owed by Properties and Trust to FLCA, as well as the Clearwater

9  debt. Debtor has no available funds to support a change of

10  location and would be forced into an immediate shutdown if

11  unable to operate on its existing premises.

12    Clearwater has guaranteed the Properties' and Trust's $10

13  million obligation and the guarantees are secured by all

14  Clearwater assets.[1]

15    Clearwater's operating loan from PCA is approximately $5.5

16  million and is likewise cross-guaranteed by Properties and

17  Trust.  The Clearwater obligations are secured by all personal

18  property owned by Clearwater including inventory, accounts

19  receivable, work in process, and cash and accounts.  Clearwater

20  owns no real property.

21    Clearwater valued the various categories of assets owned

22  on the date of the bankruptcy filing approximately as follows

23  on a going concern basis:

24  _____

25  [1] The Committee incorrectly asserts that Debtor has refused to

26  provide them with documents relating to insider borrowings.  It

27  simply took some time to gather those documents, all of which

28  were provided on June 25.

1      Equipment, furnishing and fixtures:     $580,000

2      Crops and inventory:     $8.2 million

3      Vehicles:     $266,000

4      Accounts receivable:     $737,000

5      Cash and deposits in accounts:     $5,000

6      In addition, Clearwater is obligated on a $500,000

7 operating loan provided by PCA after the Chapter 11 filing

8 which was essential to Debtor's continued operation.  That loan

9 is all due and payable on August 1, 2015 and is secured by a

10 super priority lien on all of Debtor's assets.

11 **II.   CASH COLLATERAL**

12      PCA's cash collateral includes both accounts receivable

13 and the limited amount of cash on hand when the case was filed

14 and Debtor was obligated to obtain the Court's approval prior

15 to continuing to use that collateral, which was absolutely

16 essential to continue operations.  That approval was obtained

17 pursuant to an initial cash collateral stipulation approved by

18 the Court prior to the appointment of a Creditors Committee.

19 The Committee has now challenged the basis on which Debtor

20 agreed to continue to use the collateral.  Debtor believes the

21 terms are fair and dictated by the circumstance of this case.

22 **III. PAYMENTS MADE TO LENDER AND INSIDERS SINCE THE FILING**

23      The Committee asserts that the terms on which Debtor has

24 been operating are overly generous to the lender and were

25 engineered solely for the benefit of the lender and Debtor's

26 insiders.  That assertion does not comport with the facts.

27      Since the filing, Debtor has been making monthly adequate

28 protection payments of $17,918 to PCA with respect to continued

1  use of all of Debtor's assets, most of which by their very

2  nature fluctuate greatly in value.  Much of Debtor's inventory

3  is seasonal and subject to serious depreciation if not sold on

4  a timely basis.  Equipment depreciates simply by the fact of

5  having been used. Debtors believe that the adequate protection

6  payment they agreed to was reasonable.

7       In addition, Debtor is paying a total of $92,890 in rent

8  per month to Properties pursuant to a written lease dated

9  January 2015 which is attached to this Reply as Exhibit 1.  The

10 January 2015 lease replaced an earlier lease which still had

11 years to run and is attached as Exhibit 2.  The most salient

12 differences between the two leases are that the monthly rental

13 in the current lease is reduced by $20,000 and the current

14 lease does not extend to the back 20-acre parcel.

15 Notwithstanding the new lease, the Debtor continues to use the

16 back parcel in its business operations without compensation to

17 the landlord. Of the $92,890 of rent being paid, $57,731 is

18 being paid directly to FLCA as mortgage payments.

19      In addition, Debtor insiders are being compensated for

20 services to the bankruptcy estate pursuant to approved

21 applications to employ insiders to which there were no

22 objections.  Their compensation level overall represents a

23 savings to the estate from amounts paid for comparable services

24 prior to the Chapter 11 filing.  Attached hereto as Exhibit 3

25 is a schedule showing all amounts paid to lenders and insiders

26 pre-petition and post-petition.

27 ///

28 ///

-4-

### IV.    PROSPECTS FOR REORGANIZATION

Both parcels of real property on which the Debtor operates have been for sale since the case was filed at listing prices of $5,500,000 for the 20-acre parcel and $10,000,000 for the 40-acre front parcel. Despite the fact that sellers are highly motivated to complete a sale, no reasonably acceptable offers have yet been forthcoming.  A sale or sale and leaseback of one or both properties could begin to provide a basis for a reorganization plan.

At the same time, Debtor has been shifting its product mix and restructuring its operations in an attempt to wring greater profit out of its business, with some modest success. Nevertheless, Debtor's operations have been slightly less profitable than budgeted and Debtors are very mindful of the deadline for the repayment of their administrative loan. Meanwhile, Debtors are trying to preserve the going concern value of its operations, which would be greatly devalued in liquidation.  The Committee's comment that creditors could be easily paid from the $10,000,000 book value of Debtor's assets if the lenders' claims against insiders were disregarded overlooks the fact that Debtor guaranteed all of those loans and the collateral from which the lenders would be paid would predictably be worth a fraction of the debt in liquidation.

At the outset of this case, Debtor's counsel represented to the Court that by its nature this case would have to be a short case and wrap up within one year. That has not changed. Debtors continued operation has been and will continue to be highly dependent upon lender cooperation and the mutual sense

1    that this case is moving in a productive direction, failing

2    which, operations cannot in all likelihood continue.   A

3    liquidation results in zero return to creditors and a

4    substantial shortfall to PCA and perhaps FLCA as well.

5         The cash collateral agreement which is before the Court by

6    its nature is a very short duration and will require another

7    look by the Court and creditors in less than 60 days.   Debtor

8    respectfully requests that the agreement be approved subject to

9    further review at that time.

10    Dated: June 29, 2015          HOLLISTER & BRACE,
                                    A Professional Corporation
11

12

13                                  By:_____
                                        PETER SUSI, Attorneys for
14                                      Debtor and Debtor-in-
                                        Possession
15

16

17

18

19

20

21

22

23

24

25

26

27

28

### DECLARATION OF JOHN E. DJAFROODI

I, John E. Djafroodi, declare:

1.    I am the President of Clearwater Nursery, Inc. (the "Debtor" or the "Company").

2.    I personally participate in the day to day operations of the Debtor.  As such, I have personal knowledge of the facts stated in this declaration and could and would competently testify thereto if called upon to do so.

3.    To the best of my knowledge, information and belief:

- the debt of the Company to Farm Credit West FLCA ("FLCA") and Farm Credit West PCA ("PCA") totals approximately $15,000,000 broken up as follows:

- the debts of Jafroodi Properties ("Properties") and Jafroodi Family Trust ("Trust") are secured by two adjacent parcels of real property in Nipomo on which the Company operates its business, a 20-acre rear property with greenhouses and miscellaneous other improvements and a 40-acre front property on which the bulk of the operations take place.  Both parcels are owned by Properties and secure the approximate $10,000,000 owed by Properties and Trust to FLCA, as well as the Clearwater debt. The Company has no available funds to support a change of location and would be forced into an immediate shutdown if unable to operate on its existing premises.

- the Company has guaranteed the Properties' and Trust's $10 million obligation and the guarantees are secured by all of the Company's assets.

///

1      •    the Company's operating loan from PCA is

2 approximately $5.5 million and is likewise cross-guaranteed by

3 Properties and Trust.  The Company's obligations are secured by

4 all personal property owned by the Company including inventory,

5 accounts receivable, work in process, and cash and accounts.

6 The Company owns no real property.

7      •    Clearwater is also obligated on a $500,000 operating

8 loan provided by PCA after the Chapter 11 filing which was

9 essential to Debtor's continued operation.  That loan is all

10 due and payable on August 1, 2015 and is secured by a super

11 priority lien on all of Debtor's assets.

12     4.  When advised of the Committee's request for

13 documents, I instructed our attorney to provide the Committee

14 with copies of loan documents, including all security

15 agreements and guarantees signed by Debtor in favor of PCA and

16 FLCA, which I understand was done.  It took some time to gather

17 related loan documents signed by Jafroodi entities, but I

18 instructed that those also be sent, which I believe was done on

19 June 25 and June 26.

20     5.  On its bankruptcy schedule, which I signed, I valued

21 the various categories of assets owned on the date of the

22 bankruptcy filing approximately as follows on a going concern

23 basis:

24       Equipment, furnishing and fixtures:    $580,000

25       Crops and inventory:    $8.2 million

26       Vehicles:    $266,000

27       Accounts receivable:    $737,000

28       Cash and deposits in accounts:    $5,000

1       6.   PCA's cash collateral includes both accounts

2  receivable and the limited amount of cash on hand when the case

3  was filed, which were absolutely essential to continue

4  operations.  To the best of my knowledge, the only funds

5  deposited in Debtor's bank account are proceeds of sale of

6  inventory and collections of accounts receivable and other

7  sources  traceable to PCA collateral. The Committee has now

8  challenged the basis on which the Company agreed to continue to

9  use the collateral.  The Company believes the terms are fair

10  and dictated by the circumstance of this case.

11       7.   Since the filing, the Company has been making monthly

12  adequate protection payments of $17,918 to PCA with respect to

13  continued use of all of the Company's assets, most of which by

14  their very nature fluctuate greatly in value.  Much of the

15  Company's inventory is seasonal and subject to serious

16  depreciation if not sold on a timely basis.  Equipment

17  depreciates simply by the fact of having been used. The Company

18  believes that the adequate protection payment they agreed to

19  was reasonable.

20       8.   In addition, the Company is paying a total of $92,890

21  in rent per month to Properties pursuant to a written lease

22  dated January 2015 which is attached to this Reply as Exhibit

23  1.  The January 2015 lease replaced an earlier lease which

24  still had years to run and is attached as Exhibit 2.  The most

25  salient differences between the two leases are that the monthly

26  rental in the current lease is reduced by $20,000 and the

27  current lease does not extend to the back 20-acre parcel.

28  Notwithstanding the new lease, the Debtor continues to use the

1  back parcel in its business operations without compensation to

2  the landlord.  Of the $92,890 of rent being paid, $57,731 is

3  being paid directly to FLCA as mortgage payments.

4      9.   In addition, Company insiders are being compensated

5  for services to the bankruptcy estate pursuant to approved

6  applications to employ insiders to which there were no

7  objections.  Our compensation level overall represents a

8  savings to the estate from amounts paid for comparable services

9  prior to the Chapter 11 filing.  Attached hereto as Exhibit 3

10  is a schedule which I prepared based upon the regularly

11  maintained books and records of the Company showing amounts

12  paid to lenders and insiders pre-petition and post-petition.

13      10.  I understand both parcels of real property on which

14  the Company operates have been for sale by Jafroodi Properties

15  since the case was filed at listing prices of $5,500,000 for

16  the 20-acre parcel and $10,000,000 for the 40-acre front

17  parcel, but no acceptable offers have yet been forthcoming.  I

18  believe that a sale or sale and leaseback of one or both

19  properties could provide a basis for a reorganization plan.

20      11.  During the pendency of the Chapter 11 case, the

21  Company has been shifting its product mix and restructuring its

22  operations in an attempt to generate greater profit out of its

23  business, with some modest success.  Nevertheless, the

24  Company's operations have been slightly less profitable than

25  budgeted. I am mindful of the deadline for the repayment of the

26  PCA administrative loan.  Meanwhile, the Company is trying to

27  preserve jobs for the more than 100 people it employs and the

28  going concern value of its operations, which would be greatly

1  devalued in liquidation.   I believe that the collateral from

2  which PCA would be paid would be worth a fraction of the debt

3  in liquidation.

4      I declare under penalty of perjury that the foregoing is

5  true and correct.

6      Dated this _29_ day of June, 2015 at Nipomo, California.

7

8

9                                          John E. Djafroodi

# LEASE

THIS LEASE is entered into as of this 1st day of January, 2015, between JAFROODI PROPERTIES L.P., hereinafter called the Lessor and CLEARWATER NURSERY, INC. a California corporation, hereinafter called the Lessee.

Lessor leases to Lessee, and Lessee leases from Lessor, the premises described as follows:

      Lot 16 of the Los Berros Tract, being subdivisions of Lots 15, 19 and 20 of Rancho Nipomo, per map 108, County of San Luis Obispo, State of California.

      The addresses of the property is 887 Mesa Road, Nipomo, California, upon which Clearwater presently has a greenhouse operation.  The lease shall also cover all improvements on the property consisting of approximately 1,000,000 square feet of greenhouse owned by the Lessor at this time.

**1. TERMINATION OF PRIOR UNDERSTANDINGS:** The parties are presently leasing the above-described property and this lease supersedes the terms of any prior agreements between the parties as to the leasing of the premises.

**2. TERM:**  The term of this lease shall commence on January 1, 2015 and shall terminate on January 1, 2020 with the option to renew for another 5 year period.

**3. RENT:**  Lessee shall pay without abatement, deduction or offset a minimum monthly rent of NINETY THREE THOUSAND EIGHT HUNDRED NINETY DOLLARS (93,890), in advance each month of the term of this lease, commencing January 1, 2015 and each month thereafter.  Such minimum rent shall be adjusted as of January 1 of each year in accordance with the provisions of paragraph 4.

**4. ADJUSTMENTS TO MINIMUM MONTHLY RENT:** The rent payable hereunder shall be adjusted each January 1, commencing January 1, 2016, and each year thereafter.  Such adjustments shall reflect increases in the cost of living and shall be calculated on the basis of the US City Average All Urban Consumer Price Index (the "Index"), 1982-1984=100, Standard Reference Base, published by the by the US Department of Commerce.  Such adjustments shall be made by increasing the rent payable hereunder for the preceding year by the percentage of increase of said Index each October over the same Index for the preceding October.  (By way of example, if the Index for October, 2014 is 3% greater than the Index for October, 2013, the rent for the preceding year shall be increased by 3% for the ensuing year, such increase to be paid ratably over the ensuing twelve months).  Notwithstanding the foregoing, the rental increases contemplated herein shall not exceed four percent (3%) per year.

If the Index for any applicable period shall not be published the official Index published by the Bureau of Labor Statistics (or any successor agency) which is most nearly equivalent to the Index shall be substituted.  No adjustment shall be made for decreases in the Index.

**5. TAXES:** Lessee shall pay without abatement, deduction or offset all real and personal property taxes, and general and special assessments, and other charges of every description levied on or assessed against the premises, improvements located on the premises, personal property located on or in the land or improvements, the leasehold estate, or any sublease hold estate, to the full extent of installments falling due during the term, whether belonging to or chargeable against Lessor or Lessee.  Lessee shall make all such payments upon demand of Lessor, provided Lessor furnishes written proof of such levies or assessments.

**6. USE:** Lessee shall use the premises for agricultural, greenhouses and related purposes only.

# EXHIBIT 1

7. MAINTENANCE AND REPAIR: Lessee shall, at all times during the lease term, and at Lessee's sole cost and expense, keep and maintain the leased premises, and all improvements and equipment thereof, including without limitation, greenhouses, sheds, boilers, piping, heaters, fans and other equipment appurtenant to the operation of the greenhouses, in good order, repair and safe condition, and the whole of the leased premises and improvements, in a farmer-like condition. Lessee shall, at Lessee's own cost and expense, pay all costs of tilling, harvesting, and otherwise working the premises in conformity with good farming practices in the area. Moreover, Lessee shall indemnify and save Lessor harmless from all actions, claims, and damages by reason of Lessee's failure to comply with and perform the provisions of this subsection.

8. INSURANCE:    Lessee agrees to take out and keep in force during the life of this lease at Lessee's expense, public liability insurance against any liability to the public incident to the use of the demised premises or resulting from any activities occurring in or about the demised premises. The liability insured against by such insurance shall be not less than One Million Dollars ($1,000,000) for any one person injured, One Million Dollars ($1,000,000) for any one accident, and Fifty Thousand Dollars ($50,000) for property damage. This policy or policies shall insure the contingent liability of Lessor and a certificate evidencing such insurance is to be delivered to Lessor. Lessee is to obtain written obligation on the part of the insurance carrier (s) to notify Lessor in writing at lease ten (10) days prior to the cancellation thereof, and Lessee agrees if Lessee does not keep such insurance in full force and effect, the Lessor may obtain such insurance as the Lessor deems necessary. Any premium paid by the Lessor thereof shall be charged to Lessee as a part of the next rental installment which becomes due this lease. The amounts of insurance provided for herein shall be increased from time to time in accordance with the agreement of parties, if such amounts appear to be inadequate. In the event of disagreement between the parties, either party shall have the right to demand arbitration of the question of what a reasonable amount of coverage would be, and the award of the arbitrator shall be binding upon the parties and may be confirmed in any court of competent jurisdiction.

9. BOUNDARIES:    Lessee agrees that Lessee is aware of the approximate boundaries of the leased premises and in the event of any dispute between Lessor and Lessee or any party concerning said boundaries, designation of these boundaries by Lessor shall be binding on all parties.

10. LESSOR NOT LIABLE FOR FLOOD OR SEEPAGE:    Lessor shall not be liable for any injury, damage, or loss suffered, sustained or claimed by Lessee or the employees of Lessee or any persons injured on the leased premises arising from the related to flood, seepage, or other waters upon the premises, or drainage, or lack of drainage, or irrigation or lack of irrigation or from causes beyond the control of Lessor.

11. WASTE: Lessee shall not cause, permit or suffer any waste to be committed upon the leased premises.

12. ENTRY BY OWNER:    Lessee shall permit Lessor and Lessor's agent to enter into and upon said premises at all reasonable times for the purpose of inspecting the same, or for the purpose of posting notices of non-responsibility for alterations, additions, or repairs, or for the purpose of placing upon said premises any usual or ordinary signs, without rebate of rent and without liability to Lessor for any loss of occupation or quiet enjoyment of the premises.

13. ENCUMBRANCES AND LIENS:

(a) Lessee shall not suffer or permit to be created or enforced against the leased premises, or any part thereof, any mechanic's, material-man's, contractor's or subcontractor's or laborer's lien arising from any claim growing out of a work of construction, repair, replacement or improvement, or any other claim or demand, and the Lessee shall pay or cause to be paid all of such liens, claims, or demands before any action is brought to enforce them against the leased premises.

(b) Lessee agrees to indemnify and hold Lessor harmless for any and all such liens, mortgages, deeds of trust, claims, and demands, together with reasonable attorney's fees and all costs and expenses in connection therewith.

2

(c)  In the event Lessee fails to discharge any lien as provided in subsections (a) and (b) of this paragraph, or furnish a bond against the foreclosure of such lien, Lessor may, but is not obligated to, discharge such lien or take such other action as Lessor deems necessary to prevent a judgment or foreclosure upon such lien from being executed against the leased premises and all costs and expenses, including reasonable attorney's fees incurred by Lessor, shall be repaid by Lessee upon demand, and if Lessee fails to reimburse Lessor, Lessor may treat such failure as a default under this lease.

### 14. CONDEMNATION:

(a)  If any part of the demised premises shall be taken or condemned (and a sale under threat of condemnation shall be construed as a taking or condemnation) for a public or quasi-public use, and a part thereof remains which is susceptible of occupation hereunder, this lease shall as to the part so taken, terminate as of the date title shall vest in the condemner, and the rent payable hereunder shall be adjusted so that the Lessee shall be required to pay for the remainder of the term only such portion of the rent as the value of the entire premises at the date of condemnation. In the event of a partial condemnation, Lessor shall have the option to terminate this lease as of the date title to the part so condemned vests in the condemner.

(b)  If all of the demised premises, or such part thereof, be taken or condemned so that there does not remain a portion susceptible for occupation hereunder, this lease shall terminate as of the date title shall vest in the condemner.

(c)  Lessee shall have no claim against Lessor as a result of any condemnation nor be entitled to any part or portion of the amount that may be paid or awarded as the result of the taking or condemnation of the demised premises or any part or portion thereof.  Lessee hereby assigns, transfers and sets over unto Lessor any interest which Lessee would, but for this provision, have in, to, upon, or against the demised premises or any part or portion thereof or against the amount agreed to be paid and/or awarded and paid to Lessor. The foregoing notwithstanding, Lessee shall be entitled to recovery as against the condemner for loss of Lessee's fixtures, structures and improvements erected and made by Lessee to or upon the demised premises, and for Lessee's crops growing on the demised premises.

### 15. COMPLIANCE WITH LAW:  Lessee shall comply with all governmental laws, ordinances and regulations applicable to the use of the demised premises and shall promptly comply with all government orders and directives for the correction, prevention and abatement of nuisance in or upon or connected with the demised premises, all at Lessee's sole expense.

### 16. UTILITY SERVICES:  Lessor shall provide at the beginning date of this lease the normal and customary utility service connections for the demised premises.  Lessee shall pay all charges for such utilities used on the demised premises.

### 17. ASSIGNMENT AND SUBLEASING:  Lessee shall not assign this lease, or any interest therein, and shall not sublease the demised premises or any part thereof, or any right or privileges appurtenant thereto or suffer any other person (agents and servants of Lessee excepted) to occupy or use the demised premises, or any portion thereof, without the prior written consent of Lessor.  Lessor agrees such consent shall not be unreasonably withheld, but consent to one assignment, sublease, occupation, or use by another person shall not be deemed to be a consent to any subsequent assignment, subleasing, occupation or use by another person.  Any such assignment or subleasing without Lessor's consent shall be void, and shall, at the option of the Lessor, terminate this lease.  This lease and any interest of Lessee therein, shall not be assignable by operation of law without the written consent of Lessor.

### 18. HOLD HARMLESS:  Lessor shall not be liable to Lessee or Lessee's employees, agents or invitees or to any persons whomever, for any injury to person or damage to property in, upon or about the demised premises from any cause arising at any time.  Lessee agrees to indemnify Lessor and hold her harmless from any loss, expense or claims arising out of any damage or injury unless such damage or injury results from Lessor's willful or negligent acts or omissions.

3

**19. HOLDING OVER:** Should Lessee, or any or its successors in interest, hold over the demised premises, or any part thereof, after expiration of the term of this lease, unless otherwise agreed in writing, such holding over shall constitute and be construed as a tenancy from month to month only, on the rental terms and conditions expressed in this lease.

**20. DEFAULT BY LESSEE:** The occurrence of any of the following shall constitute a default by the Lessee:

(a) Failure to pay rent when due, if the failure continues for ten (10) days after notice has been given to Lessee;

(b) Abandonment and vacating of the premises; failure to occupy and operate the premises for ten (10) consecutive days shall be deemed an abandonment and vacating;

(c) The appointment of a receiver to take possession of all or substantially all of the assets of Lessee or a general assignment by Lessee for the benefit of creditors, or any action taken or suffered by Lessee under any insolvency or bankruptcy act;

(d) Failure to perform any other provision of this lease if the failure to perform is not cured within thirty (30) days after notice has been given to Lessee. If the default cannot reasonably be cured within thirty (30) days Lessee shall not be in default of this lease if Lessee commences to cure the default within the thirty (30) day period and diligently and in good faith continues to cure the default.

Notices given under this paragraph shall specify the alleged default and the applicable lease provisions, and shall demand that Lessee perform the provisions of this lease or pay the rent that is in arrears, as the case may be, within the applicable period of time; or quit the premises. No such notice shall be deemed a forfeiture or a termination of this lease unless Lessor so elects in the notice.

**21. LESSOR'S REMEDIES ON LESSEE'S DEFAULT:** Lessor shall have the following remedies if Lessee commits a default. These remedies are not exclusive; they are cumulative and in addition to any remedies now or hereafter allowed by law:

(a) Lessor can continue this lease in full force and effect, and the lease will continue in effect as long as Lessor does not terminate Lessee's right to possession, and Lessor shall have the right to collect rent when due. During the period when Lessee is in default, Lessor can enter the premises and relate them, or any of them, to third parties for Lessee's account. Lessee shall be liable immediately to Lessor for all costs Lessor incurs in re-letting the premises, including, without limitation, broker's commissions and like costs. Lessee shall pay to Lessor the rent due under this lease on the dates the rent is due, less the rent Lessor receives from any re-letting. No act by Lessor allowed by this paragraph shall terminate this lease unless Lessor notifies Lessee that Lessor elects to terminate.

(b) Lessor can terminate Lessee's right to possession of the premises at any time. No act by Lessor other than giving notice to Lessee shall terminate this lease. Acts of maintenance, efforts to re-let the premises, or the appointment of a receiver on Lessor's initiative to protect Lessor's interest under this lease shall not constitute a termination of Lessee's right to possession. On termination, Lessor has the right to recover from Lessee:

(1) The worth, at the time of the award, of the unpaid rent that had been earned at the time of the termination of this lease;

(2) The worth, at the time of the award, of the amount by which the unpaid rent that would have been earned after the date of termination of this lease until the time of the award exceeds that amount of the loss of rent that Lessee proves could have been reasonably avoided;

4

(3) The worth, at the time of the award, of the amount by which the unpaid rent for the balance of the term after the time of the award exceeds the amount of the loss of rent that Lessee proves could have been reasonably avoided;

(4) Any other amount and court costs, necessary to compensate Lessor for all detriment proximately caused by Lessee's default.

"The worth at the time of the award", as used in (1) and (2) of this paragraph is to be computed by allowing interest at the rate of ten percent (10%) per annum. "The worth at the time of the award", as referred to in (3) of this paragraph is to be computed by discounting the amount at the discount rate of the Federal Reserve Bank of San Francisco at the time of the award plus one percent (1%).

(c) If Lessee is in default of this lease, Lessor shall have the right to have a receiver appointed to collect rent and conduct Lessee's business. Neither the filing of a petition for the appointment of a receiver, nor the appointment itself, shall constitute an election by Lessor to terminate this lease.

(d) Lessor, at any time after Lessee commits a default, can cure the default at Lessee's cost. If Lessor at any time by reason of Lessee's default, pays any sum or does any act that requires the payment of any sum, the sum paid by Lessor shall be due immediately from Lessee to Lessor at the time the sum is paid, and if paid at a later date shall bear interest at the rate of ten percent (10%) per annum from the date the sum is paid by Lessor until Lessor is reimbursed by Lessee. This sum, together with interest on it shall be additional rent.

(e) Rent not paid when due shall bear interest at the rate of ten percent (10%) per annum from the date due until paid.

**22. WAIVER OF DEFAULT:** No waiver by the parties hereto of any default or breach of any terms, condition or covenant of this lease shall be deemed to be a waiver of any subsequent default or breach of the same or any other term, condition or covenant contained herein.

**23. ATTORNEY'S FEES:** In the event that either party hereto shall bring legal action against the other party to enforce any of the terms, covenants and conditions hereof, or to otherwise exercise any of the rights of Lessor or Lessee under this agreement or under law, then the prevailing party shall be entitled to reimbursement by the other party for all expenses thus incurred, including reasonable attorneys' fees.

**24. QUIET ENJOYMENT:** Lessor warrants that Lessor has full right and power to execute and perform this lease and to grant the estate demised herein and that Lessee, on payment of the rent and performing the covenants herein contained, shall peaceably and quietly have, hold and enjoy the demised premises during the full term of this lease; provided, however, that Lessee accepts this lease subject and subordinate to any recorded mortgage, deed of trust, or other lien presently existing on the demised premises.

**25. WEEDS AND PESTS:** Lessee shall, during the term of this lease, control all weeds and foul growth, noxious or otherwise, growing on the leased premises and the margin of any roads, in accordance with good farming practices of the area. Lessee shall furnish all material and labor necessary to poison squirrels, rodents, and other pests on the premises, as provided or required by law.

**26. SUCCESSORS:** The terms, conditions and covenants contained in this lease shall apply to, inure to the benefit of, and be binding upon the parties hereto and their respective successors in interest and legal representatives except as otherwise herein expressly provided. All rights, powers, privileges, immunities and duties of Lessor under this lease, including without limitation any notices required or permitted to be delivered by Lessor to Lessee hereunder, may, at Lessor's option, be exercised or performed by Lessor's agent or attorney.

**27. ABANDONMENT OF PREMISES:** Lessee shall not vacate or abandon the premises at any time during the term. If Lessee shall abandon, vacate or surrender the demised premises, or be dispossessed by

5

process of law or otherwise, any personal property belonging to Lessee and left on the premises shall be deemed to be abandoned, at the option of the Lessor, except such property as may be mortgaged to Lessor.

**28. USE OF LANGUAGE:** Words of any gender used in this lease shall be held and construed to include any other gender and words in the singular shall be held to include the plural, unless the context otherwise requires.

**29. NOTICE:** Any notice or document required or permitted to be delivered hereunder shall be deemed to be delivered whether actually received or not when deposited in the United States mail, postage prepaid, registered or certified mail, return receipt requested, addressed to the parties hereto at the respective addresses as they have thereto specified by written notice delivered in accordance herewith.

**30. MISCELLANEOUS:**

(a) The voluntary or other surrender of this lease by Lessee, or a mutual cancellation thereof shall not work a merger and shall, at the option of the Lessor, terminate all or any existing subleases or sub-tenancies, or may, at the option of Lessor, operate as an assignment to it of any or all such subleases or sub-tenancies.

(b) Time is of the essence of this lease.

(c) If there is more than one Lessee, the obligation hereunder imposed upon Lessee shall be joint and several.

(d) Any provision of this lease which shall prove to be invalid, void or illegal, shall in no way affect, impair or invalidate any other provision herein and such other provisions shall remain in full force and effect.

(e) No remedy or election hereunder shall be deemed exclusive but shall, wherever possible, be cumulative with all other remedies at law or equity.

(f) All provisions, whether covenants or conditions, on the part of Lessee shall be deemed to be both covenants and conditions.

IN WITNESS WHEREOF, the parties hereto have executed this LEASE at Oxnard, California, as of the day and year first above written.

Jafroodi Properties L.P., Lessor

By _____
    Mahmood Jafroodi

Clearwater Nursery, Inc., a
California Corporation,
Lessee

By _____
    John E. Djafroodi
    President

6

# LEASE

THIS LEASE is entered into as of this 1st day of January, 2013, between JAFROODI PROPERTIES L.P., hereinafter called the Lessor and CLEARWATER NURSERY, INC. a California corporation, hereinafter called the Lessee.

Lessor leases to Lessee, and Lessee leases from Lessor, the premises described as follows:

Parcel 2 of Parcel Map CO 06-0174, Lot 7, and Lot 16 of the Los Berros Tract, being subdivisions of Lots 15, 19 and 20 of Rancho Nipomo, per maps 108, County of San Luis Obispo, State of California.

The addresses of these properties are 906 Eucalyptus Rd and 887 Mesa Road, Nipomo, California, upon which Clearwater presently has a greenhouse operation. The lease shall also cover all improvements on the property consisting of approximately 1,600,000 square feet of greenhouse owned by the Lessor at this time.

**1. TERMINATION OF PRIOR UNDERSTANDINGS:** The parties are presently leasing the above-described property and this lease supersedes the terms of any prior agreements between the parties as to the leasing of the premises.

**2. TERM:** The term of this lease shall commence on January 1, 2013 and shall terminate on January 1, 2018.

**3. RENT:** Lessee shall pay without abatement, deduction or offset a minimum monthly rent of ONE HUNDRED THIRTY ONE THOUSAND THREE HUNDRED AND SEVENTEEN DOLLARS (131,317), in advance each month of the term of this lease, commencing January 1, 2013 and each month thereafter. Such minimum rent shall be adjusted as of January 1 of each year in accordance with the provisions of paragraph 4.

**4. ADJUSTMENTS TO MINIMUM MONTHLY RENT:** The rent payable hereunder shall be adjusted each January 1, commencing January 1, 2014, and each year thereafter. Such adjustments shall reflect increases in the cost of living and shall be calculated on the basis of the US City Average All Urban Consumer Price Index (the "Index"), 1982-1984=100, Standard Reference Base, published by the by the US Department of Commerce. Such adjustments shall be made by increasing the rent payable hereunder for the preceding year by the percentage of increase of said Index each October over the same Index for the preceding October. (By way of example, if the Index for October, 2014 is 4% greater than the Index for October, 2013, the rent for the preceding year shall be increased by 4 percent for the ensuing year, such increase to be paid ratably over the ensuing twelve months). Notwithstanding the foregoing, the rental increases contemplated herein shall not exceed four percent (4%) per year.

If the Index for any applicable period shall not be published the official Index published by the Bureau of Labor Statistics (or any successor agency) which is most nearly equivalent to the Index shall be substituted. No adjustment shall be made for decreases in the Index.

**5. TAXES:** Lessee shall pay without abatement, deduction or offset all real and personal property taxes, and general and special assessments, and other charges of every description levied on or assessed against the premises, improvements located on the premises, personal property located on or in the land or improvements, the leasehold estate, or any sublease hold estate, to the full extent of installments falling due during the term, whether belonging to or chargeable against Lessor or Lessee. Lessee shall make all such payments upon demand of Lessor, provided Lessor furnishes written proof of such levies or assessments.

**6. USE:** Lessee shall use the premises for agricultural, greenhouses and related purposes only.

**EXHIBIT 2**

**7. MAINTENANCE AND REPAIR:** Lessee shall, at all times during the lease term, and at Lessee's sole cost and expense, keep and maintain the leased premises, and all improvements and equipment thereof, including without limitation, greenhouses, sheds, boilers, piping, heaters, fans and other equipment appurtenant to the operation of the greenhouses, in good order, repair and safe condition, and the whole of the leased premises and improvements, in a farmer-like condition. Lessee shall, at Lessee's own cost and expense, pay all costs of tilling, harvesting, and otherwise working the premises in conformity with good farming practices in the area. Moreover, Lessee shall indemnify and save Lessor harmless from all actions, claims, and damages by reason of Lessee's failure to comply with and perform the provisions of this subsection.

**8. INSURANCE:** Lessee agrees to take out and keep in force during the life of this lease at Lessee's expense, public liability insurance against any liability to the public incident to the use of the demised premises or resulting from any activities occurring in or about the demised premises. The liability insured against by such insurance shall be not less than One Million Dollars ($1,000,000) for any one person injured, One Million Dollars ($1,000,000) for any one accident, and Fifty Thousand Dollars ($50,000) for property damage. This policy or policies shall insure the contingent liability of Lessor and a certificate evidencing such insurance is to be delivered to Lessor. Lessee is to obtain written obligation on the part of the insurance carrier (s) to notify Lessor in writing at lease ten (10) days prior to the cancellation thereof, and Lessee agrees if Lessee does not keep such insurance in full force and effect, the Lessor may obtain such insurance as the Lessor deems necessary. Any premium paid by the Lessor thereof shall be charged to Lessee as a part of the next rental installment which becomes due this lease. The amounts of insurance provided for herein shall be increased from time to time in accordance with the agreement of parties, if such amounts appear to be inadequate. In the event of disagreement between the parties, either party shall have the right to demand arbitration of the question of what a reasonable amount of coverage would be, and the award of the arbitrator shall be binding upon the parties and may be confirmed in any court of competent jurisdiction.

**9. BOUNDARIES:** Lessee agrees that Lessee is aware of the approximate boundaries of the leased premises and in the event of any dispute between Lessor and Lessee or any party concerning said boundaries, designation of these boundaries by Lessor shall be binding on all parties.

**10. LESSOR NOT LIABLE FOR FLOOD OR SEEPAGE:** Lessor shall not be liable for any injury, damage, or loss suffered, sustained or claimed by Lessee or the employees of Lessee or any persons injured on the leased premises arising from the related to flood, seepage, or other waters upon the premises, or drainage, or lack of drainage, or irrigation or lack of irrigation or from causes beyond the control of Lessor.

**11. WASTE:** Lessee shall not cause, permit or suffer any waste to be committed upon the leased premises.

**12. ENTRY BY OWNER:** Lessee shall permit Lessor and Lessor's agent to enter into and upon said premises at all reasonable times for the purpose of inspecting the same, or for the purpose of posting notices of non-responsibility for alterations, additions, or repairs, or for the purpose of placing upon said premises any usual or ordinary signs, without rebate of rent and without liability to Lessor for any loss of occupation or quiet enjoyment of the premises.

**13. ENCUMBRANCES AND LIENS:**

    (a) Lessee shall not suffer or permit to be created or enforced against the leased premises, or any part thereof, any mechanic's, material-man's, contractor's or subcontractor's or laborer's lien arising from any claim growing out of a work of construction, repair, replacement or improvement, or any other claim or demand, and the Lessee shall pay or cause to be paid all of such liens, claims, or demands before any action is brought to enforce them against the leased premises.

    (b) Lessee agrees to indemnify and hold Lessor harmless for any and all such liens, mortgages, deeds of trust, claims, and demands, together with reasonable attorney's fees and all costs and expenses in connection therewith.

(c) In the event Lessee fails to discharge any lien as provided in subsections (a) and (b) of this paragraph, or furnish a bond against the foreclosure of such lien, Lessor may, but is not obligated to, discharge such lien or take such other action as Lessor deems necessary to prevent a judgment or foreclosure upon such lien from being executed against the leased premises and all costs and expenses, including reasonable attorney's fees incurred by Lessor, shall be repaid by Lessee upon demand, and if Lessee fails to reimburse Lessor, Lessor may treat such failure as a default under this lease.

## 14. CONDEMNATION:

(a) If any part of the demised premises shall be taken or condemned (and a sale under threat of condemnation shall be construed as a taking or condemnation) for a public or quasi-public use, and a part thereof remains which is susceptible of occupation hereunder, this lease shall as to the part so taken, terminate as of the date title shall vest in the condemner, and the rent payable hereunder shall be adjusted so that the Lessee shall be required to pay for the remainder of the term only such portion of the rent as the value of the entire premises at the date of condemnation. In the event of a partial condemnation, Lessor shall have the option to terminate this lease as of the date title to the part so condemned vests in the condemner.

(b) If all of the demised premises, or such part thereof, be taken or condemned so that there does not remain a portion susceptible for occupation hereunder, this lease shall terminate as of the date title shall vest in the condemner.

(c) Lessee shall have no claim against Lessor as a result of any condemnation nor be entitled to any part or portion of the amount that may be paid or awarded as the result of the taking or condemnation of the demised premises or any part or portion thereof. Lessee hereby assigns, transfers and sets over unto Lessor any interest which Lessee would, but for this provision, have in, to, upon, or against the demised premises or any part or portion thereof or against the amount agreed to be paid and/or awarded and paid to Lessor. The foregoing notwithstanding, Lessee shall be entitled to recovery as against the condemner for loss of Lessee's fixtures, structures and improvements erected and made by Lessee to or upon the demised premises, and for Lessee's crops growing on the demised premises.

**15. COMPLIANCE WITH LAW:** Lessee shall comply with all governmental laws, ordinances and regulations applicable to the use of the demised premises and shall promptly comply with all government orders and directives for the correction, prevention and abatement of nuisance in or upon or connected with the demised premises, all at Lessee's sole expense.

**16. UTILITY SERVICES:** Lessor shall provide at the beginning date of this lease the normal and customary utility service connections for the demised premises. Lessee shall pay all charges for such utilities used on the demised premises.

**17. ASSIGNMENT AND SUBLEASING:** Lessee shall not assign this lease, or any interest therein, and shall not sublease the demised premises or any part thereof, or any right or privileges appurtenant thereto or suffer any other person (agents and servants of Lessee excepted) to occupy or use the demised premises, or any portion thereof, without the prior written consent of Lessor. Lessor agrees such consent shall not be unreasonably withheld, but consent to one assignment, sublease, occupation, or use by another person shall not be deemed to be a consent to any subsequent assignment, subleasing, occupation or use by another person. Any such assignment or subleasing without Lessor's consent shall be void, and shall, at the option of the Lessor, terminate this lease. This lease and any interest of Lessee therein, shall not be assignable by operation of law without the written consent of Lessor.

**18. HOLD HARMLESS:** Lessor shall not be liable to Lessee or Lessee's employees, agents or invitees or to any persons whomever, for any injury to person or damage to property in, upon or about the demised premises from any cause arising at any time. Lessee agrees to indemnify Lessor and hold her harmless from any loss, expense or claims arising out of any damage or injury unless such damage or injury results from Lessor's willful or negligent acts or omissions.

3

**19. HOLDING OVER:** Should Lessee, or any or its successors in interest, hold over the demised premises, or any part thereof, after expiration of the term of this lease, unless otherwise agreed in writing, such holding over shall constitute and be construed as a tenancy from month to month only, on the rental terms and conditions expressed in this lease.

**20. DEFAULT BY LESSEE:** The occurrence of any of the following shall constitute a default by the Lessee:

    (a) Failure to pay rent when due, if the failure continues for ten (10) days after notice has been given to Lessee;

    (b) Abandonment and vacating of the premises; failure to occupy and operate the premises for ten (10) consecutive days shall be deemed an abandonment and vacating;

    (c) The appointment of a receiver to take possession of all or substantially all of the assets of Lessee or a general assignment by Lessee for the benefit of creditors, or any action taken or suffered by Lessee under any insolvency or bankruptcy act;

    (d) Failure to perform any other provision of this lease if the failure to perform is not cured within thirty (30) days after notice has been given to Lessee.  If the default cannot reasonably be cured within thirty (30) days Lessee shall not be in default of this lease if Lessee commences to cure the default within the thirty (30) day period and diligently and in good faith continues to cure the default.

Notices given under this paragraph shall specify the alleged default and the applicable lease provisions, and shall demand that Lessee perform the provisions of this lease or pay the rent that is in arrears, as the case may be, within the applicable period of time; or quit the premises.  No such notice shall be deemed a forfeiture or a termination of this lease unless Lessor so elects in the notice.

**21. LESSOR'S REMEDIES ON LESSEE'S DEFAULT:** Lessor shall have the following remedies if Lessee commits a default.  These remedies are not exclusive; they are cumulative and in addition to any remedies now or hereafter allowed by law:

    (a) Lessor can continue this lease in full force and effect, and the lease will continue in effect as long as Lessor does not terminate Lessee's right to possession, and Lessor shall have the right to collect rent when due.  During the period when Lessee is in default, Lessor can enter the premises and relate them, or any of them, to third parties for Lessee's account.  Lessee shall be liable immediately to Lessor for all costs Lessor incurs in re-letting the premises, including, without limitation, broker's commissions and like costs.  Lessee shall pay to Lessor the rent due under this lease on the dates the rent is due, less the rent Lessor receives from any re-letting.  No act by Lessor allowed by this paragraph shall terminate this lease unless Lessor notifies Lessee that Lessor elects to terminate.

    (b) Lessor can terminate Lessee's right to possession of the premises at any time.  No act by Lessor other than giving notice to Lessee shall terminate this lease.  Acts of maintenance, efforts to re-let the premises, or the appointment of a receiver on Lessor's initiative to protect Lessor's interest under this lease shall not constitute a termination of Lessee's right to possession.  On termination, Lessor has the right to recover from Lessee:

        (1) The worth, at the time of the award, of the unpaid rent that had been earned at the time of the termination of this lease;

        (2) The worth, at the time of the award, of the amount by which the unpaid rent that would have been earned after the date of termination of this lease until the time of the award exceeds that amount of the loss of rent that Lessee proves could have been reasonably avoided;

(3) The worth, at the time of the award, of the amount by which the unpaid rent for the balance of the term after the time of the award exceeds the amount of the loss of rent that Lessee proves could have been reasonably avoided;

(4) Any other amount and court costs, necessary to compensate Lessor for all detriment proximately caused by Lessee's default.

"The worth at the time of the award", as used in (1) and (2) of this paragraph is to be computed by allowing interest at the rate of ten percent (10%) per annum. "The worth at the time of the award", as referred to in (3) of this paragraph is to be computed by discounting the amount at the discount rate of the Federal Reserve Bank of San Francisco at the time of the award plus one percent (1%).

(c) If Lessee is in default of this lease, Lessor shall have the right to have a receiver appointed to collect rent and conduct Lessee's business. Neither the filing of a petition for the appointment of a receiver, nor the appointment itself, shall constitute an election by Lessor to terminate this lease.

(d) Lessor, at any time after Lessee commits a default, can cure the default at Lessee's cost. If Lessor at any time by reason of Lessee's default, pays any sum or does any act that requires the payment of any sum, the sum paid by Lessor shall be due immediately from Lessee to Lessor at the time the sum is paid, and if paid at a later date shall bear interest at the rate of ten percent (10%) per annum from the date the sum is paid by Lessor until Lessor is reimbursed by Lessee. This sum, together with interest on it shall be additional rent.

(e) Rent not paid when due shall bear interest at the rate of ten percent (10%) per annum from the date due until paid.

**22. WAIVER OF DEFAULT:** No waiver by the parties hereto of any default or breach of any terms, condition or covenant of this lease shall be deemed to be a waiver of any subsequent default or breach of the same or any other term, condition or covenant contained herein.

**23. ATTORNEY'S FEES:** In the event that either party hereto shall bring legal action against the other party to enforce any of the terms, covenants and conditions hereof, or to otherwise exercise any of the rights of Lessor or Lessee under this agreement or under law, then the prevailing party shall be entitled to reimbursement by the other party for all expenses thus incurred, including reasonable attorneys' fees.

**24. QUIET ENJOYMENT:** Lessor warrants that Lessor has full right and power to execute and perform this lease and to grant the estate demised herein and that Lessee, on payment of the rent and performing the covenants herein contained, shall peaceably and quietly have, hold and enjoy the demised premises during the full term of this lease; provided, however, that Lessee accepts this lease subject and subordinate to any recorded mortgage, deed of trust, or other lien presently existing on the demised premises.

**25. WEEDS AND PESTS:** Lessee shall, during the term of this lease, control all weeds and foul growth, noxious or otherwise, growing on the leased premises and the margin of any roads, in accordance with good farming practices of the area. Lessee shall furnish all material and labor necessary to poison squirrels, rodents, and other pests on the premises, as provided or required by law.

**26. SUCCESSORS:** The terms, conditions and covenants contained in this lease shall apply to, inure to the benefit of, and be binding upon the parties hereto and their respective successors in interest and legal representatives except as otherwise herein expressly provided. All rights, powers, privileges, immunities and duties of Lessor under this lease, including without limitation any notices required or permitted to be delivered by Lessor to Lessee hereunder, may, at Lessor's option, be exercised or performed by Lessor's agent or attorney.

**27. ABANDONMENT OF PREMISES:** Lessee shall not vacate or abandon the premises at any time during the term. If Lessee shall abandon, vacate or surrender the demised premises, or be dispossessed by

5

process of law or otherwise, any personal property belonging to Lessee and left on the premises shall be deemed to be abandoned, at the option of the Lessor, except such property as may be mortgaged to Lessor.

**28. USE OF LANGUAGE:** Words of any gender used in this lease shall be held and construed to include any other gender and words in the singular shall be held to include the plural, unless the context otherwise requires.

**29. NOTICE:** Any notice or document required or permitted to be delivered hereunder shall be deemed to be delivered whether actually received or not when deposited in the United States mail, postage prepaid, registered or certified mail, return receipt requested, addressed to the parties hereto at the respective addresses as they have thereto specified by written notice delivered in accordance herewith.

**30. MISCELLANEOUS:**

(a) The voluntary or other surrender of this lease by Lessee, or a mutual cancellation thereof shall not work a merger and shall, at the option of the Lessor, terminate all or any existing subleases or sub-tenancies, or may, at the option of Lessor, operate as an assignment to it of any or all such subleases or sub-tenancies.

(b) Time is of the essence of this lease.

(c) If there is more than one Lessee, the obligation hereunder imposed upon Lessee shall be joint and several.

(d) Any provision of this lease which shall prove to be invalid, void or illegal, shall in no way affect, impair or invalidate any other provision herein and such other provisions shall remain in full force and effect.

(e) No remedy or election hereunder shall be deemed exclusive but shall, wherever possible, be cumulative with all other remedies at law or equity.

(f) All provisions, whether covenants or conditions, on the part of Lessee shall be deemed to be both covenants and conditions.

IN WITNESS WHEREOF, the parties hereto have executed this LEASE at Oxnard, California, as of the day and year first above written.

Jafroodi Properties L.P., Lessor

By _____
Mahmood Jafroodi

Clearwater Nursery, Inc., a
California Corporation,
Lessee

By _____
John E. Djafroodi
President

6

## Rent Increase/Decrease Agreement

This rent increase/decrease agreement is entered into as of this 1st day of July 2013 between JAFROODI PROPERTIES L.P., hereinafter called the Lessor and CLEARWATER NURSERY, INC. a California Corporation, hereinafter called the Lessee.

Effective July 1, 2013 the rent for the property you occupy at 906 Eucalyptus Rd and 887 Mesa Rd Nipomo, California , upon which Lessee presently has a greenhouse operation, will be decreased by $18,427 per month from $131,317 to $112,890 per month, payable on the 1st day of each month.

All other terms per our rental agreement dated January 1, 2013 continue to remain in effect.

Jafroodi Properties L.P., Lessor

By

Mahmood Jafroodi

Clearwater Nursery, Inc., a California Corporation, Lessee

By

John E. Djafroodi
President

**Monthly Rent and Salary Comparison Pre & Post Petition**

|  | Pre-petition | Post-Petition |
|---|---|---|
| **Rent Payments** | | |
| Jafroodi Properties | $  55,159 | $  35,159 |
| Farm Credit West - Property | $  57,731 | $  57,731 |
| Farm Credit West - Interest on Property | $  17,918 | $  17,918 |
| **Salaries** | | |
| Chairman of the Board - Mahmood Jafroodi | $  8,935 | $  8,935 |
| President - Eric Djafroodi | $  7,393 | $  7,393 |
| VP Sales - Guy Miel | $  5,684 | $  - |
| VP Operations - TJ Cape | $  5,938 | $  - |
| Sales & Operations Support - Omead Jafroodi | | $  4,500 |
| Total Salaries | $  27,948 | $  20,827 |

**EXHIBIT 3**

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
1126 Santa Barbara Street, Santa Barbara, CA  93101

A true and correct copy of the foregoing document entitled (*specify*): <u>REPLY TO OBJECTION OF OFFICIAL</u>
<u>COMMITTEE OF UNSECURED CREDITORS TO MOTION FOR ORDER AUTHORIZING USE OF CASH</u>
<u>COLLATERAL</u>
_____

will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in
the manner stated below:

**1.  <u>TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)</u>:**  Pursuant to controlling General
Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*)
<u>6/29/15</u>_____ , I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that
he following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated
below:

[ x ]  Service information continued on attached page

**2.  <u>SERVED BY UNITED STATES MAIL</u>:**
On (*date*) <u>6/29/15</u>_____ , I served the following persons and/or entities at the last known addresses in this bankruptcy
case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail,
first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the
judge <u>will be completed</u> no later than 24 hours after the document is filed.

[ x ]  Service information continued on attached page

**3.  <u>SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL</u> (state method**
**for each person or entity served):**  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) <u>6/29/15</u>_____ , I served
the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to
such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration
that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is
filed.

[ x ]  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| | | |
|---|---|---|
| <u>6/29/15</u> | ·Susan Meza | *(signature)* |
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**SERVICE LIST**
Clearwater Nursery, Inc.
Chapter 11 Case No.:  9:15-bk-10251-DS

## SERVED ELECTRONICALLY

**Brian D Fittipaldi**  brian.fittipaldi@usdoj.gov
**Michael J Gomez**  mjg@lrplaw.net, tara@lrplaw.net
**Jonathan Gura**  jgura@hbsb.com, tina@hbsb.com
**Cassie K Jones** jones@gleaveslaw.com, kristy@gleaveslaw.com
**Mette H. Kurth** mkurth@foxrothschild.com, vcordi@foxrothschild.com,
pchlum@foxrothschild.com
**Rene Lastreto**  rl2@lrplaw.net, tara@lrplaw.net, rebecca@lrplaw.net
**Sandra McBeth**  donna@mcbethlegal.com
**Ashley M Naporlee**  Ashley@grantlawyers.com, donna@grantlawyers.com
**Peter Susi**  psusi@hbsb.com, tina@hbsb.com
**United States Trustee (ND)**  ustpregion16.nd.ecf@usdoj.gov

## SERVED BY U.S. MAIL

COMMITTEE OF UNSECURED CREDITORS

Decowraps
c/o Mendez Law Offices
P.O. Box 228630
Miami, FL  33172

The Arbory, Ltd.
c/o Alex Pijl
4079 Thirteenth Street
Jordan Station, ON
L0R 1S0, Canada

Fred C. Gloeckner & Co.
c/o Yves Grebert
550 Mamaroneck Avenue
Harrison, NY  10528

Custom Labor Services, Inc.
125 W. Mill Street
Santa Maria, CA  93458

Robert Mann Packaging, Inc.
c/o Allen York
340 El Camino Real South
Building 36
Salinas, CA  93901

1

**SERVED VIA FEDERAL EXPRESS**

The Honorable Deborah Saltzman
U.S. Bankruptcy Court
255 E. Temple Street, Suite 1334
Courtroom 1339
Los Angeles, CA  90012